Good morning, Your Honors. May it please the Court, my name is Leslie Bowman, and I'm before the Court today on behalf of my client, Jamir Valle Martinez, the appellant. I'd like to reserve five minutes for my rebuttal. Your Honors, there are obviously quite a number of issues presented in the briefs today, but there are two specifically that I want to be sure to address in the oral argument. The first is the bringing to argument, and there are also a number of the sentencing issues that I'd like to present to the Court today. In terms of the bringing to argument, Your Honors, in this case, the case of United States v. Lopez is dispositive. There was insufficient evidence presented during trial to convict Mr. Valle Martinez of the substantive counts of bringing to the United States. How can you distinguish our subsequent decision in Hernandez-Oriana as it explains and interprets Lopez where a conspiracy is charged, and he was acting allegedly in furtherance of that conspiracy by transporting that movement? Your Honor, I will concede that there was sufficient evidence in regards to the conspiracy charge. I think the way that Hernandez-Oriana is distinct in this case is in terms of the substantive counts, which were counts two through eight of the indictment. Didn't the government subsequently dismiss those counts? No, Your Honor. Okay. I'm sorry. I'm confusing it with another case where they went back after Lopez was decided and moved to dismiss. Which is perhaps what they should have done, but that's not what occurred in this case. We have concurrent sentences here, don't we? We do have concurrent sentences, Your Honor, but I do not believe that it's harmless error because this was such a complicated and serious case that the judge clearly did and could have taken into consideration all of the convictions. Well, but what really drove the sentence in this case was the horrific injuries that were suffered, right? That's true, Your Honor. And assuming in response to your prior answer to my question that you're not challenging the sufficiency in regard to the conspiracy conviction for driving the vehicle that resulted in the deaths, as a practical matter, what difference would it make if we were to remand for resentencing if we accept your argument that somehow the substantive bringing two counts should fall? Your Honor, it's the appellant's position that there are going to be other issues that will require this court to be remanded for sentencing. And for the sake of the clarity of the record, it would be beneficial to the court, I believe, to have only the counts before it that are truly going to depend on the convictions. In other words, if the case had no other issues, I would agree with the court that perhaps it wouldn't be as critical to argue about the substantive counts. But in this case where there are also some very significant procedural sentencing errors, I believe it would be cleaner to remand on only the counts where there's sufficient evidence and for the purpose of a resentencing on the sentencing issues. Could you help me with the evidence in this case? Because I'm having trouble seeing why the transportation in this case doesn't comply with the Lopez definition of brings two. That's to say, it looks like it's a continuous thing. Like, you cross on foot, they're met by your client's vehicle, he picks them up and continues on the journey. There was no stopping over. I mean, they just changed from one mode of transportation, feet, to a motorized vehicle. Help me understand why, in your view, that's not bringing two within the meaning of Lopez. Well, Your Honor, I think the issue then is whether Mr. Valle-Martinez aided and abetted. Because there's absolutely no evidence in the record to indicate that he participated in any extraterritorial conduct. I don't think the government even would argue that Mr. Valle-Martinez was in Mexico or had anything to do with the arrangements in Mexico. At least there's no evidence in the record. So I believe that the court's question is when the guides crossed the people over the border, and I don't think from the record we're entirely sure how long the people had been in the United States. But I think that the record indicates that it would have been the same day. Then Mr. Valle-Martinez arrived to pick them up. It appears that the government is arguing that because the foot guides got into the transport vehicle, that that indicates that the offense was a continuing offense. I disagree with that, because there's no evidence whatsoever that these particular guides did anything except get into the vehicle, perhaps for their own purpose. According to the government's brief, I believe it's on page 71, the government indicates that these guides entered the vehicle in order to travel further into the country. Page 71 of the government's brief says that Zepeda Cruz and Wilbert Garcia were guides and merely passengers in the truck. Now, are you working off the definition of drops off? That is to say, as I read the evidence, it's permissible, would have been permissible for the jury to say this is one continuous trip. It's not as though they dropped them off at a safe house and your client shows up a day later. Your Honor, I... Are you arguing that the mere change of mode of transportation from feet to a motorized vehicle, that terminates the brings to? Not just the mere change of the mode of transportation, but also the ending of the foot guides' role. Because in other cases that have been decided by the court, the guides do something when the aliens are entering the vehicle. They assist them in some way. They tell them to get in. They communicate with the driver. There's a connection. So you're arguing that if the foot guides materially help, like, here, let me help you out of the truck, and da-da-da-da-da, and then they go on the truck journey as part of the brings to. But if the foot guides are tired and rest under the tree, but make it clear that here's the trucks that are going to take you on, that that's not brings to? Well, Your Honor, I don't think they actually said, here are the trucks. They gave them information before they crossed the border about what would happen, but there's no evidence in the record that once the vehicles arrived, that the guides did anything except get into the truck for their own purpose, which was to travel further into the United States. And what case law do you have that tells us that the active involvement with the guides at the transition point from foot travel to truck travel is the key determinant for the bring to question? Your Honor, the case that I would rely on is actually the case of United States v. Nelson. It's not the same crime. It's an armed robbery case. But what it talks about is that aiding and abetting can only occur if the crime is an armed robbery case. If the crime has not been completed. Your Honor, there was some discussion in the Lopez case about what Defendant Lopez did. It talked about that she spoke twice with the people who may have been the initial transporters, and also that she could describe the transporters, so she may have met that person. That case is somewhat analogous in that the court seemed to be looking for a connection between the initial transporters and the person who was driving the car. But the in-bank court rejected the argument that you appear to be making that the crime is complete as soon as the international boundary is crossed. We specifically rejected that in the majority opinion in Lopez, didn't we? Yes, you did, and Your Honor, that's actually not the argument I'm making. And that's why I tried to distinguish that if the guides had continued to, in some sort of conduct, that would have assisted the person who picked up only on the U.S. side. But you'd have a much stronger case if the guides had simply delivered the aliens to the truck and then walked off on their own in a different direction. Definitely. Okay, but you don't have that. The problem is the record here, as Judge Fletcher points out, shows merely a change in the mode of conveyance from foot to truck. And I'm trying to understand, even in light of Lopez, how that makes a difference. Your Honor, I would also rely on the case of Hernandez-Orellana, where there is some language that indicates that the defendant in that case had no link to the extra-territorial conduct. I think this case would be different if Mr. Valle-Martinez had spoken by radio to the guides while they were still in Mexico, or if there had been something that would have linked him in terms of aiding and abetting to the extra-territorial conduct. But if, as the government is arguing in its brief, the evidence is essentially part and parcel of the same crossing, then under Hernandez-Orellana, the aiding and abetting doesn't require actual connection with somebody on the other side of the border. To go back to Nelson, the driver of the getaway vehicle is liable just as much as the bank robber is liable if he's waiting in the parking lot and picks up the robber right after the robbery is committed. So why isn't this more like a traditional aiding and abetting of the principal offense? Your Honor, I would argue that the issue with the aiding and abetting is that in this particular case, the statute that we're relying on, which is Title VIII, Section 1324, specifically divides the conduct into four distinct offenses. And the first one is the bringing to the United States. The second one is transporting or moving within the United States. And because the guides had completed bringing these people to the United States... Well, that's the problem I'm having with your argument, is in order to agree with you, I have to agree that the change in the method of conveyance is the point at which the guide services ended. I think that that would be based on the record. There's no evidence in this record that those guides did anything else to assist in this offense except get into the vehicle. The front of the vehicle. I'm just wondering if you would act toward the patient here. They're still involved. They're still involved in the aiding. Well, Your Honor, I don't think the record supports that they're necessarily still involved. They got into the same truck that they aided. But I was wondering if you keep saying they hadn't done anything. They got into their... Anyplace. I certainly would. I agree with that. In any case, Your Honors, I'd like to move on to some of the sentencing issues. One of the arguments that I wanted to discuss is the Rule 32H notice. Your Honors, the court did not provide notice of the departures. That it apparently intended to make at the sentencing. The court found that the base offense level was 33, and it then proceeded to depart based on a number of factors. One of the factors was the number of deaths involved in the case. Counsel, the problem I'm having with your Rule 32H argument is that all of the grounds on which the court departed are flagged in the pre-sentence report. And how did you not have adequate notice based on, for example, the number of deaths that that might be an aggravator that would influence the court's sentencing decision? Your Honor, I was well aware that it could be an aggravator, which I would have considered something akin to allowing the court, well, of course the court always has discretion, but to sentence at perhaps the high end of the guideline, and although there was notice in the pre-sentence report, there was no legal basis given. Well, the author of the pre-sentence report recommended that the court find that this was a case outside the heartland because of the number of deaths that were involved. That's pretty explicit notice that at least the probation officer is recommending the court consider a departure from whatever the guideline range might be. Is it not? Your Honor, that could be considered notice regarding that particular factor. I guess what I'm trying to find, your argument I think has to be, I didn't have adequate notice and I was prejudiced by the fact that my client got a longer sentence, but what was it that you didn't have notice of after reading the pre-sentence report and the government's sentencing memorandum that you think violated Rule 32H when the court imposed a 421th sentence? Well, the one obvious factor would have been the obstruction of justice, and nobody could have given me notice of that because that was an incident that occurred the morning of the sentencing. And the court should have considered a continuance on that. You asked for one? I did not ask for a continuance. Do we view that under plain error in light of the Supreme Court's decision in Irizarry? Well, your Honor, it could be reviewed for plain error, except that there's also, those were facts that were a prejudicial surprise. I did bring that to the court's attention, that I didn't have time to investigate this. I had no way to look into whether it was true or contact witnesses, anything like that. And clearly in regards to the third prong of the Irizarry test, that did affect the presentation of evidence during the hearing. I guess, what would you have done? I mean, you have the victim who the court heard testify at the trial, and then the victim testifies again at the sentencing hearing that your client assaulted him in the marshal's lockup, and the judge makes a factual finding that the assault was in retaliation for the testimony against your client. What good would a continuance have done you at that point? I would have investigated the matter. This was supposed to have occurred in the prison facility. While they were chaining up the people. Exactly. Clearly there were witnesses. There were other inmates and corrections officers. I would have liked to know what really happened, especially in light of the fact that the person that testified had been dishonest about a number of other factors, including not admitting why my client had the black eye. He made up a story that was not credible. I would have liked to investigate the facts of that before the hearing. Your Honor, also in terms of notice, the underrepresentation of the criminal history, the fact that the court found that the criminal history was properly two instead of one, there was the opposite of notice on that. The pre-sentence report at paragraph 103 indicated that no departure was recommended, although it was something that could be considered an aggravating factor. Perhaps incorrectly, I did address that in a certain way, but I didn't focus on it, because it was my feeling that the probation officer was recommending that the person should be released. I would have liked to have known that there would be no departure. Those are the issues on notice, unless there are any questions. Now, you've used it pretty much all your time, but we'll make sure you have a chance to respond after the government takes its turn. Thank you, Your Honor. May it please the Court, my name is John Granoff. I represent the United States of America in this case. Your Honors, the conviction and sentence in this case should be affirmed. The first issue I want to address is the Lopez issue. The government's position is that the case of Lopez does not provide this defendant with any shelter at all. In Lopez, this Court held that the guides brought the aliens across into the United States, they dropped them off, and then they left. At that point, when the aliens were dropped off, the crime terminated. In this case, based on the questioning of my co-counsel, my counsel over here, that occurred. This case, that did not occur, rather. The crime continued. The aliens in this case were guided across into the United States, and then the guides waited. Before that, before the crossing, they were actually given instructions about the vehicles that would pick them up. They were told that there was going to be a white vehicle and a black vehicle. They were told that half of the group was to get into one vehicle and the other half was to get into another vehicle. And the defendant is the person who came in the white vehicle, in the F-350, with the black vehicle, and they picked up the aliens. Half of the group got into the white vehicle, at least two of the guides got into the white F-350, and they continued. Therefore, under this scenario, when the defendant picked up the aliens, the crime was continuing, unlike Lopez. Relating to the notice issues that the counsel raised, the pre-sanction report, Your Honors, clearly reflects that there was going to be, gave the counsel notice of the departures based on the number of deaths and based on the criminal history as well. Pages 17 and 18 in the pre-sentence report is bold, Part E, State Circumstances that May Warrant a Departure from the United States Sentencing Guidelines. I'm sorry, can I come back to the bringing to under Lopez? I'm having trouble understanding precisely how Lopez should be applied. At some point, the bringing to stops, and the crime is finished. And my question is, well, when does it stop? Why isn't it a decent argument to say, well, as soon as one mode of transportation ends and another begins, okay, they have been brought to. That sounds like a nice, clean break. And whether or not they left them under a train to wait for an hour, or whether they were picked up right away, why should that matter? Well, Lopez court specifically held that the crime terminated after the conduct of the initial transporter terminated. And the court said, in other words, at the point when the aliens are dropped off at a location within the United States, that's when the crime ends. In this case, the aliens were never dropped off anywhere. The government's position is that this crime ended when people were killed. I understand the government's position. Are you saying, then, that if the guides brought them across on foot, and it said the trucks will be here in a minute, walked away, and the trucks were there in a minute, and they get on, that the drivers of the truck within the meaning of Lopez are not involved in the crime of bringing to? If the drivers, I'm sorry, if the guides brought them across? The foot guides bring them across the border.  The foot guides then say to the smuggled aliens that a white truck is going to be here in about a minute. And you get into that truck. And the foot guides walk away. And sure enough, in about a minute, the white truck shows up. The foot guides are within easy vision sight, and they get in. And have they been dropped off and, therefore, bringing to is complete? It would depend on other facts. In your example, it would depend on the driver's link, if there were any prior links to the foot guides before that happened. In prior links, like they telephoned one another so that this was an arrangement? Other evidence. Some other evidence. Well, it's clear that they're working in cahoots. It's clear that they're working in cahoots when they drop them off and leave them for two days in a safe house. So my question is, when does the bringing to stop? Not whether they're involved in the same conspiracy. They clearly are. Correct. And I'm going based upon the precedent of this court. And Lopez holds that that occurs when the aliens are dropped off at a location within the United States. And I'm trying to figure out what dropped off means. Right. I understand your question. And the governor's position is that when aliens are dropped off, that means that the guides separate from the aliens and leave. I mean, when I take my children to daycare, I drop them off and then I leave. That's what dropped off means. I think that that's the plain meaning of what the term dropped off means, is that there has to be a discontinuation of the conduct and actually dropping someone off and then turning around and going the other direction. I think that's what the plain meaning means. However, alternatively, there would be another theory of conviction in this case, and that could be, which is not addressed in Lopez or Hernandez-Arellano, and that could be the Pinkerton theory of liability. But I don't think the court needs to reach that issue in this particular case. It was addressed, but I don't believe the court, it was raised in the government's brief. I don't believe that issue, that the government actually argued a Pinkerton theory of liability. Let me ask you this. What was your theory or proof, if there was any, as to where the aliens were going to be dropped off? If your theory is that when the chase and the accident occurred, the movement was still continuing, where were they being moved to, a safe house somewhere in Tucson or Phoenix, or do we know? I don't really think that there's an answer to that question, other than the fact that the expert testimony establishes kind of what types of locations these aliens are dropped off during these types of organizations. With regard to the cooperating witnesses in this case, the agents never asked them, where were you taking these guys? I think, well, there was one cooperating co-defendant who testified. Did he know? I don't believe he knew, Your Honor. Okay. But that cooperating co-defendant did testify that he actually illegally entered himself a few days before, on October 11th, and he was actually brought into the United States. He testified about his journey, how his cousin assisted him in bringing him into the United States illegally. His cousin, Beto, his name was, and brought him to the Phoenix area. So I can only assume that that's the area where they were going. Unless the Court has any other questions on the Lopez issue. I should know this for the record, and I think I know, but I want to make sure. Were any of the guides in the defendant's truck when he finally had that catastrophic accident? The evidence is that two of the guides got into the white vehicle. Were they still in the vehicle when they had the catastrophic crash? One of the guides, Jose Luis Cepeda Cruz, fled the scene of the crash with a co-defendant. He was actually identified by the co-defendant. So we know for sure that one of the guides was still in that truck at that time? He fled the scene, and he was identified by the co-defendant as in the truck, and then one of the other witnesses testified that two of the guides got into the truck. I believe one of the guides may have actually been extracted from the truck and actually was injured, but I can't recall exactly. Okay. Two were aboard when the accident occurred? That's what you're presuming? Yes, Your Honor. So we didn't have a, quote, handoff of they're all yours now? No, there was no handoff. There was no dropping off in this case, Your Honor. As far as the notice issue is concerned, I believe that the pre-sentence report adequately gave the defendant notice on the departures based on the number of deaths and also for the criminal history. Keep your voice up. I'm sorry, Your Honor. Relating to the obstruction of justice issue that counsel has raised. As the court knows, that happened on the day of sentencing. And the defendant beat one of the cooperating witnesses, called him a rat. The court did make credibility findings. Counsel raised that issue under 32H as far as notice. I would like to read in the record that the prosecutor, when this occurred, and this would be on the transcripts on page 76. Actually, this witness was actually called by the co-defendant in that case. And before the prosecutor began his cross-examination, he did state, Your Honor, before I begin questioning, I just want to put the court and Ms. Bowman on notice, and this is on page 76, that there was, I think she already knows this part, but there was an altercation, I believe, between the witness and her client this morning that may, depending upon the testimony, form a basis for another theory that is threatening or intimidating a witness. Counsel did not make an objection at that point. She did not request a continuance at that point. In her brief, she does not articulate how she would have been prejudiced if she had that continuance, especially based on the court's credibility findings in this issue. She just claims lack of notice. I would further point to the court that on this type of a case, that the notice requirements in Rule 32H appear not to even apply to a Chapter 3 adjustment in sentence. If the court looks at that rule, it applies to departures. So I believe that that provision does not even apply as far as the notice provision. So, for example, if, for example, a defendant testified at a sentencing hearing and lied and committed perjury in front of the judge, would the judge be required to continue the sentence hearing for two weeks before imposing the obstruction of justice adjustment? No. I don't think that this is much different. And I think that the Rule 32H departure does not apply to this provision. Unless there's any other questions from the court on any of the other issues in the brief, I will ask. No questions on the bench. I would ask the court to affirm the conviction and sentence in this case. Thank you. Okay. Thank you. Ms. Bowman, would you like a chance to respond? Your Honor, in terms of the government's argument about bringing to, being able to rely on Pinkerton, that was addressed in the Hernandez-Oriana case. And the court distinguished between conspiracy and aiding and abetting. The court found that where the defendant was a member of the conspiracy but did not participate in the pre-border crossing conduct, that that would relate to the substantive charges, not the conspiracy count. I mean, those are just basic principles of accomplice liability under substantive criminal law, right? Yes, exactly. Going back to your Nelson example, the driver of the getaway vehicle is responsible for the bank robbery, even if all he did was to drive the getaway car. And that's true, Your Honor. The issue would then be when the offense ended. And in regards to the government's argument about notice, the prejudice to the defendant was that without an opportunity to investigate and to present a real adversarial argument on the obstruction of justice, Mr. Valle-Martinez received a two-level upward enhancement in his sentence. Obviously, that's prejudicial. If there could have been evidence presented to the court where the judge may not have accepted the government's position, that would be the prejudice to the defendant. What's your response to opposing counsel's argument that you were warned by the AUSA at the beginning of the sentencing that they were going to get into what happened in the holding facility and that that might constitute the grounds for upward adjustment? Doesn't that put the ball in your court to say, Your Honor, I'm totally surprised. I know nothing about this, and I respectfully request a continuance. So I can investigate it and respond. Yes, Your Honor, and I did half of that, not the other half. I did explain to the judge that I had not had an opportunity to investigate, but I did not ask for additional time. And I don't want to make too much of a point of this. At this point, we don't know what an investigation would have revealed. That's correct. We can't be sure whether that, I mean, the story might have been entirely true. Yeah, okay. In terms of the fact, though, that Rule 32H doesn't apply to those types of adjustments, that's not logical because, obviously, the point of Rule 32H is to provide notice to the parties so that a sentencing hearing can be adversarial. So if it affects the guideline range or is going to affect the sentence, the notice needs to be sufficient. What did the Supreme Court mean in Irizarry in your estimation, Counsel, that there is still a substantive distinction between departures and variances? Your Honor, what I think that they meant in Irizarry is that a variance would be on a Title 18 United States Code Section 3553 variance, but that anything that's going to depart from the base level offense of the guidelines still requires notice. And the judge found that the base offense level was 33. So everything above that required notice. Okay. Thank you very much. Thank both sides for your helpful argument. The United States v. Vargas-Martinez is now submitted for decision. That completes our calendar for this morning. We will resume tomorrow here at 9 o'clock. Thank you very much.
judges: Nelson, Fletcher, Tallman